No. 05-404

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 158N

MARYLYNN MAYER,

        Plaintiff and Appellant,

   v.

BILLINGS NISSAN, LLC,

        Defendant and Respondent.

APPEAL FROM:    The District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 2004-0321,
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Jeffrey A. Simkovic, Simkovic Law Firm, Billings, Montana
                Mary Ann Sutton, Attorney at Law, Missoula, Montana

        For Respondent:

                James R. Halverson, Jesse D. Cook, Halverson & Gilbert, P.C.,
                Billings, Montana

Submitted on Briefs:  March 29, 2006

Decided:  July 12, 2006

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent.  It shall be filed as a public document with the Clerk of the Supreme Court and its case title, Supreme Court cause number and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2     Marylynn Mayer (Mayer) appeals a defense jury verdict in the Thirteenth Judicial District, Yellowstone County, that she was not wrongfully discharged by Billings Nissan, LLC (Billings Nissan).  We affirm.

¶3     Mayer raises three issues on appeal:

¶4     1.  Did the District Court err in not allowing Mayer to impeach Dean Benjamin (Benjamin) with his prior inconsistent statements?

¶5     2.  Did the District Court err in not allowing Mayer to impeach Benjamin with an undisclosed demonstrative exhibit?

¶6     3.  Did the District Court err in not instructing the jury on punitive damages?

¶7     Concluding that the first two issues are dispositive, we will not address the third issue.

## FACTUAL BACKGROUND

¶8     On October 14, 2003, Benjamin, general manager of Billings Nissan, fired Mayer from her position as finance manager.  On her dismissal form, Benjamin listed Mayer's rudeness to customers, insubordination, and poor work quality as reasons for her termination.  Mayer, however, asserted that she never had disciplinary problems before her termination,

2

and that Billings Nissan management never counseled her, formally or informally, about her rudeness to customers or her substandard work quality.

¶9 Mayer alleges that Billings Nissan engaged in the illegal practice of "padding" used vehicles, and that Billings Nissan wrongfully fired her after she confronted management, on a number of occasions, about the practice of padding, and after she ultimately refused to finance a vehicle until she viewed all the documents associated with that vehicle to be sure padding had not occurred. According to Mayer, padding a used vehicle involves a dealership fraudulently listing items or features on an automobile that do not exist in order to obtain a larger loan amount for a customer or to qualify a customer's otherwise substandard credit risk.

¶10 In order to pad a used vehicle, one must use a computer program such as Karpower, the program used by Billings Nissan in this case. When one enters a vehicle's VIN number into Karpower, a generic list of options on that vehicle are displayed. However, the list of options generated by Karpower does not necessarily reflect all of the options actually present on the vehicle. Additional options not listed by Karpower can be entered into Karpower manually. The printed list of options, or the "book-out" sheet, is then used internally within the dealership for pricing purposes and also sent to financial institutions for financing purposes. Thus, whoever operates the program has the opportunity to fraudulently add options to the list which are not actually present on the vehicle in order to price the vehicle higher and obtain a larger loan amount from the financial institution.

¶11 At trial, Benjamin conceded that Billings Nissan made mistakes using the Karpower

3

program, but despite Mayer's assertions to the contrary, he testified that Mayer never discussed padding of vehicles with him. Benjamin stated that he never heard a customer, other than those who testified at trial, voice a complaint over options listed on cars that did not exist, and he also testified that a book-out sheet with additional options not present on a vehicle would rarely affect the approval of a customer loan because the primary factors in the approval of a loan are the customer's credit history, time on the job, and time spent in the area.

¶12    Regarding Mayer's termination, Benjamin testified that, on October 14, 2003, Mayer became excessively belligerent under the mistaken belief that a sales meeting had been held, without her presence, concerning her performance. Mayer's declining customer satisfaction scores were brought up during the sales meeting, but the meeting was not called on account of her. Throughout the day, on October 14, Mayer used obscene language, demanded Benjamin make the sales crew respect her, threw documents on the floor, and repeatedly urged that she be fired since no one in the office respected her or wanted her there. After advising Mayer to take a few days off to cool down, which she refused, Benjamin acceded to her demands and fired her.

4

¶13    During his examination of Benjamin, Jeffrey A. Simkovic (Simkovic), Mayer's counsel, made numerous attempts to impeach Benjamin with alleged prior inconsistent statements purportedly made by Benjamin in a pretrial affidavit Benjamin filed supporting his motion for a protective discovery order.  These attempts at impeachment included Simkovic trying to have Benjamin read his affidavit to the jury and an attempt by Simkovic to read the affidavit to Benjamin himself.  Upon each attempt, Defense counsel objected on the grounds of "form," and the trial judge sustained each objection.  The court informed Simkovic that his line of questioning was not appropriate.

> THE COURT:  Mr. Simkovic . . . .  This line of questioning is not going to fly. You can rephrase anything you want with your attempts to get this affidavit in the way you're going, and it's not going to happen.  So you've tried three times.  If you ask another question like you've asked about this, I urge you to also read the rule on contempt.  I'm not here to make a law school exam out of this, but the Rules of Evidence are there.  There are ways of getting the answer that you want, but you're not doing it, and you're not going to do it by repeatedly asking this question. . . .

¶14    Simkovic then asked the court to be heard and told the trial judge he was attempting to impeach Benjamin.  The court replied:

> THE COURT:  Well, then impeach him.  Do it the right way.  You're not doing it the right way, and I'm not going to instruct you how to do it.

¶15    Reverting to his previous tactics, Simkovic made two more attempts to impeach Benjamin with his affidavit, first, by asking Benjamin to read his affidavit and then by asking Benjamin whether he would make any changes to his affidavit.  Defense counsel objected on each attempt as to "form," and the court sustained the objections.  Later, Simkovic again attempted to impeach Benjamin with the Karpower program.  Because Simkovic had not

5

listed the Karpower program in the exhibit list attached to the Final Pre-Trial Order, the trial judge did not allow Simkovic to introduce it into evidence.

¶16    A unanimous jury found in favor of Billings Nissan, and Mayer timely appealed.

## STANDARD OF REVIEW

¶17    A district court has broad discretion in determining the admissibility of evidence. *State v. Hicks*, 2006 MT 71, ¶ 19, 331 Mont. 471, ¶ 19, 133 P.3d 206, ¶ 19. Consequently, we will not overturn a district court's evidentiary ruling absent a showing of abuse of discretion. *Hicks*, ¶ 19.

## DISCUSSION

¶18    **1. Did the District Court err in not allowing Mayer to impeach Benjamin with his prior inconsistent statements?**

¶19    Mayer argues on appeal that the trial judge did not allow her to impeach Benjamin. She argues that the case turned on whether the jury believed her or Benjamin, and absent impeachment evidence, the jury viewed her cause of action for wrongful discharge in a vacuum. We take Mayer's argument to mean that Mayer was unable to conclusively prove that illegal padding occurred under Benjamin's management at Billings Nissan. She could not, therefore, prove that Billings Nissan had a wrongful motive to fire her. Under Mayer's theory, the case simply turned on whether the jury found her more credible than Benjamin. If the jury had been able to find her testimony more credible, the fact-finder could have inferred that Billings Nissan did, in fact, have a wrongful motive for firing her. Mayer maintains that this critical battle over credibility depended on her ability to impeach Benjamin with prior

6

inconsistent statements made by him, under oath, in his pretrial affidavit.

¶20    Mayer stretches the record to make her claim.  Our examination of the record reveals that Benjamin testified consistently with his pretrial affidavit.  In addition, the record discloses that Mayer did have opportunity to question Benjamin on his affidavit.

¶21    At trial, Benjamin testified regarding a book-out sheet for a customer named Leray McEntyre:

> Q.  (By Mr. Simkovic) – how would these options that he previously testified are not on his vehicle come up?
> A.  (By Dean Benjamin)  When you plug in the VIN number, it already knows that it's four-wheel drive, half-ton, V-8, short box.  *Some of the options you have to manually add but not all of them.*  [Emphasis added.]
> . . . .
> Q.  He said he didn't have an auxiliary fuel tank.  How did that come up?
> A.  *Someone had to manually add it.*  [Emphasis added.]

¶22    From this testimony, Mayer argues that Benjamin testified that the Karpower program could be manually altered, while in his affidavit, he had claimed that the Karpower program could not be manually altered.  The claimed inconsistency is more imaginary than real.  The relevant portion of Benjamin's affidavit is as follows:

> 6.  To obtain an options list for the Horn vehicle, I simply got the VIN number from the vehicle and entered it into Nissan's Karpower program.  The Karpower program then generated a list of options that were to be included on the vehicle.  *No extra options were added to this list generated by Karpower.*  [Emphasis added.]

¶23    First, Benjamin's affidavit clearly references a particular client, Horn.  The testimony at issue concerned an entirely different client, Leray McEntyre.  Second, in his discussion regarding client Horn, Benjamin makes no generalized statement as to how the Karpower

7

program functions. Rather, Benjamin states that, for the Horn deal, he did not manually enter additional options to those generated by the Karpower program. Benjamin's statement that he *did not* add additional options to the list generated by Karpower for the Horn deal cannot be reasonably construed to mean that one *cannot* manually enter additional options into the program. Additionally, Benjamin's statement that "[n]o extra options were added to this list generated by Karpower" leads to the inference that one can add options to the list generated by Karpower.

¶24 In order to impeach Benjamin with the claimed prior inconsistent statement from Benjamin's pretrial affidavit, Simkovic had to first demonstrate that Benjamin made an inconsistent statement while on the stand. *State v. Baker*, 2000 MT 307, ¶ 18, 302 Mont. 408, ¶ 18, 15 P.3d 379, ¶ 18; *State v. Pinkerton*, 270 Mont. 287, 291-92, 891 P.2d 532, 535. As noted above, Benjamin made no inconsistent statement while on the stand; thus, had Simkovic further examined Benjamin, he would have verified that Benjamin's affidavit and his trial testimony were in accordance with one another rather than contradictory. Instead of detracting from Benjamin's credibility, as he intended, Simkovic would have bolstered it.

¶25 Furthermore, Simkovic did have the opportunity to impeach Benjamin with his affidavit. After a first round of attempts by Simkovic to impeach Benjamin with his affidavit, Simkovic refocused his inquiry and questioned Benjamin about the Karpower program. Simkovic then returned to the affidavit and questioned Benjamin extensively regarding the Horn deal.

Q. I thought you said in your affidavit you created the Horn deal.

8

A. I don't believe I did. I worked up the numbers on the deal from the day before, but I don't believe I produced the book-out sheet.
Q. I'll read you what you say, Mr. Benjamin.
A. Is this in the affidavit?

¶26 Simkovic then attempted to read Benjamin's affidavit to him. Defense counsel objected on the grounds of form and the court sustained.

MR. SIMKOVIC: He just said he didn't do it, Your Honor.
THE COURT: Well, that's true. So you've been able to now talk to him about the affidavit, but this objection is sustained. You still need to ask questions.
Q. (By Mr. Simkovic) Is it your testimony here today that you did not do the book-out sheet on the Horn deal?
A. No, sir, I did not do the book-out sheet on the deal. In the deposition it should have said –
Q. Deposition?
A. The deposition, whatever you quoted. Affidavit, I'm sorry.
Q. Created by you.
A. I signed it, yes.
Q. Created by your attorney?
A. I'm not sure who created it. I did read it and I did sign it. But it says "we", meaning the company, Billings Nissan. That's how we got the VIN number of the car.
Q. Show me where it says we on there.
A. I don't know where it is. Which one are you reading from?
Q. I'm reading from your affidavit that was signed by you on October 5th of 2004.
A. Okay.
Q. Okay. So did you or didn't you do this book-out sheet for Kermit Horn?
A. I did not do this book-out sheet, no.
Q. Why did you say that you did?
A. It should say "we".
Q. Who would be "we"?
A. Whoever did the book-out sheet. "We" being the company.

¶27 Simkovic diverged from the affidavit and then once again returned to it and the Horn deal:

9

Q. And no one at Billings Nissan ever saw that car?

A. Other than the lot personnel that washed the car and the driver we hired to deliver it, no.

Q. So you—if your affidavit is true, someone else at Billings Nissan made up that window sticker?

A. We're not talking about a window sticker, sir.

Q. Book-out sheet.

A. Yes. We need a book-out sheet to get sent in with the loan.

Q. So you or someone who works for you made it up?

A. Correct, based on the VIN number that we were provided that we bought the van from.

Q. Karpower didn't generate that?

A. Yes, Karpower did generate that.

Q. All those—all those extras?

A. All the equipment, I have no idea.

. . . .

Q. Do you see a VIN number on here?

A. No.

Q. So these must have been manually done then?

A. Possibly.

Q. By you, or someone who works for you?

A. Possibly, I don't know.

Q. By you in your affidavit.

¶28    To the extent that this colloquy shows anything but confusion, the District Court did allow Simkovic to impeach Benjamin. The District Court did not allow Simkovic to impeach Benjamin in the manner in which Simkovic desired. The court never told Simkovic he could not question Benjamin about the affidavit. Clearly, the District Court afforded Simkovic the opportunity to make his point effectively by asking questions in the proper form. That Simkovic was unable to do so is hardly the fault of the trial judge.

¶29    Nevertheless, Simkovic brought to light what he believed to be inconsistencies in Benjamin's affidavit by posing a question to Benjamin and giving Benjamin a chance to explain the claimed inconsistency. This was clearly the line of questioning the court desired,

10

and Simkovic, instead of refocusing his inquiry on the alleged prior inconsistent statements, continued his inquiry regarding the Horn deal and eventually moved on from the affidavit altogether.

¶30     We conclude that the court allowed Simkovic to impeach Benjamin with his prior inconsistent statements, to the extent that they were inconsistent, but that Simkovic neglected to fully take advantage of the opportunity afforded to him.  Thus, the District Court did not abuse its discretion in its handling of Simkovic's attempts to impeach Benjamin.

¶31     **2. Did the District Court err in not allowing Mayer to impeach Benjamin with an undisclosed demonstrative exhibit?**

¶32     In another attempt to impeach Benjamin, Simkovic obtained a copy of the Karpower program used by Billings Nissan with the purpose of having Benjamin demonstrate to the jury how it worked.  In doing this, Simkovic again sought to establish the purported inconsistency in Benjamin's testimony.

¶33     Unfortunately, Simkovic failed to disclose the Karpower exhibit in Mayer's exhibit list attached to the Final Pre-Trial Order.  In *Watkins v. Williams*, 265 Mont. 306, 315-16, 877 P.2d 19, 24-25, we held that evidence not produced during discovery and not listed in the parties' exhibit list or in the court's pretrial order was properly excluded from trial.  Thus, it was not an abuse of discretion for the trial judge to exclude the exhibit since Simkovic failed to list the demonstrative exhibit, the Karpower program, in Mayer's pretrial exhibit list attached to the Final Pre-Trial Order.

## CONCLUSION

11

¶34    We hold that the District Court did not abuse its discretion in its handling of Simkovic's attempts to impeach Benjamin, and that the District Court did not abuse its discretion in excluding the undisclosed demonstrative exhibit.

¶35    Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ PATRICIA COTTER